NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

———————————————————
                                                            :
ASSOCIATION OF NEW JERSEY              :
CHIROPRACTORS, et al., individually and :
on behalf of all others similar situated        :
                                                            :
                              Plaintiffs,               :              Civil Action No. 09-3761 (JAP)
                                                            :
                    v.                                     :
                                                            :
AETNA, INC.,                                        :
  et al.                                                   :              **OPINION**
                                                            :
                                                            :
                              Defendants.            :
———————————————————:

PISANO, District Judge.

        Plaintiffs Association of New Jersey Chiropractors, New York Chiropractors Council,

Illinois Chiropractic Society, International Chiropractors Association ("Association

Plaintiffs"), Donna Restivo, Todd Carnucci, Christopher Fogila, Peter Manz, Mark Vincent,

Jeffrey Shirlty, Vicky Yarns, Caroline Grossman, and Leon Egozi ("Individual Plaintiffs;"

together with Association Plaintiffs, "Plaintiffs") bring this putative class action against

Aetna, Inc., Aetna Health Inc., Aetna Health Inc. (DE), Aetna Health Inc. (PA), Aetna Health

Plans of New Jersey, Inc., Aetna Health Management, Inc., Aetna Health Administrators,

LLC, Aetna Health Management, LLC, Aetna Life Insurance Company, Corporate Health

Insurance, Inc., and Aetna Insurance Company of Connecticut (collectively, "Aetna" or

"Defendants") alleging violations of the Racketeer Influenced and Corrupt Organizations Act

("RICO"), 18 U.S.C. § 1961 *et seq.* and the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001, *et seq*.  Presently before the Court are the following five motions: (1) motion by Defendants to dismiss the First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6); (2) motion by Defendants to strike Plaintiff's class action allegations; (3) motion by Defendants to enforce a settlement agreement and release and to dismiss Plaintiff Foglia's claims; and (4) motion by Defendants to compel arbitration and to dismiss Plaintiffs Egozi's and Manz's claims; and (5) cross-motion by Plaintiffs under the theory of judicial estoppel for an order precluding Defendants from denying that ERISA applies to the conduct alleged in the FAC.  For the reasons below, Defendants' motion to dismiss is granted as to Plaintiff's RICO claims and denied in all other respects.  Defendants' motion to enforce the settlement agreement and their motion to compel arbitration are granted.  Defendants' motions to strike class allegations and Plaintiffs' cross-motion are denied.

**I.  Background**[1]

The plaintiffs in this case are licensed medical providers or chiropractic professional associations.  Defendant Aetna is an insurer that offers, underwrites and administers commercial health plans ("Plans") through which healthcare expenses incurred by Plan participants for services covered by the Plans are reimbursed by Aetna pursuant to the terms of the Plan.

At times relevant to this case, the Individual Plaintiffs regularly submitted claims for reimbursement to Aetna for healthcare services they provided to Aetna insureds.  Their claims

---

[1]In addressing a motion to dismiss, the Court must accept as true the allegations contained in a complaint.  *See Toys "R" US, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003); *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1301 (3d Cir. 1996).  Accordingly, the facts recited herein are taken from the complaint unless otherwise indicated and do not represent this Court's factual findings.

for benefits were submitted directly to Aetna on behalf of the insureds, and Aetna paid benefits for such services directly to the provider.   Prior to making such payment, Aetna would evaluate the claim and make the determination that the treatments in question were "Covered Services", *i.e.*, covered under the terms the insured's respective Plan.  Benefit payments were made only for such Covered Services.

Aetna maintains a Special Investigation Unit ("SIU") to detect, investigate and prevent insurance fraud.  According to Plaintiffs, the primary means by which the SIU identifies false or fraudulent insurance claims is through "Post Payment Audits." FAC ¶ 6.  Such audits are primarily directed to providers of medical services.  Plaintiffs describe the audits as a "retrospective review of previously paid insurance benefits to evaluate whether payments for Covered Services were properly made" to an insured or a provider.  *Id.*  In selecting a provider to audit, "Aetna relies upon a variety of complex statistical analyses and data-mining to identify providers that exhibit potentially problematic or non-traditional billing patterns." *Id.*

In conducting certain of these Post Payment Audits, the SIU works in conjunction with the National Healthcare Anti-Fraud Association ("NHCAA") and International Business Machines Corporation ("IBM"), both of whom assist Aetna in developing and implementing policies relative to these audits.  For Post Payment Audits resulting from employer groups retroactively reporting individual insureds' terminations, Aetna works in conjunction with AfterMath Claim Science ("AfterMath"), an overpayment recovery company.  According to Plaintiffs, Aetna outsources these audits to Aftermath, who performs the audits and engages in efforts to recoup overpayments.

Aetna conducted Post Payment Audits of each Individual Plaintiff.  As a result of these audits, Aetna determined that certain benefits paid to the Individual Plaintiffs were in fact overpaid and Aetna, by letter, demanded reimbursement from the providers for those amounts.  Specifically, Aetna demanded that Dr. Restivo repay $50,650.02; Dr. Carnucci repay $597,643.00; Dr. Foglia repay $15,609.88; Dr. Manz repay $20,290.09; Dr. Vincent repay $8,879.96; Dr. Shirley repay $96,819.69; Dr. Yarns repay $368,556.14; Dr. Grossmann repay $648.00; and Dr. Egozi repay $299,796.22.  Plaintiffs have received numerous communications from Aetna and its counsel seeking to compel payments of these amounts, including correspondence from the SIU's outside legal counsel that the FAC describes as "threatening."  FAC ¶10.  Further, the Individual Plaintiffs have been subject to a pre-payment review process by which every claim a provider submits to Aetna is reviewed prior to payment.  Plaintiffs allege that under this process, claims submitted by the providers are uniformly denied regardless of validity and no means of appeal is provided.

According to Plaintiffs, Aetna has made and continues to make similar demands for the repayment of previously paid benefits against members of the Association Plaintiffs throughout the country.  Plaintiffs contend that the actions of Aetna described in the FAC violate ERISA and RICO.  Accordingly, they seek, *inter alia*, (1) unpaid benefits and interest; (2) declarations that Aetna violated various obligations under federal law; (3) an order enjoining Aetna from seeking to further recover alleged overpayments and directing Aetna to return any funds it collected based on its allegedly improper recoupment efforts; and (4) treble RICO damages.

## II.  Discussion

A.  Motion to Dismiss Under Rule 12(b)(6)

1.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a court may grant a motion to dismiss if the complaint fails to state a claim upon which relief can be granted.  The Supreme Court set forth the standard for addressing a motion to dismiss under Rule 12(b)(6) in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  The *Twombly* Court stated that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]"  *Id.* at 555 (internal citations omitted); *see also Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (stating that standard of review for motion to dismiss does not require courts to accept as true "unsupported conclusions and unwarranted inferences" or "legal conclusion[s] couched as factual allegation[s]") (internal quotation marks omitted).  Therefore, for a complaint to withstand a motion to dismiss under Rule 12(b)(6), the "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ..." *Twombly*, 550 U.S. at 555 (internal citations and footnote omitted).

The Supreme Court has emphasized that, when assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  When evaluating a motion to dismiss for failure to state a claim, district courts conduct a three-part analysis.

First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1947 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950. Third, "whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Id.* This means that our inquiry is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged.

*Malleus v. George*, --- F.3d --- (3d Cir. 2011). A complaint will be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570). This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler*, 578 F.3d at 211 (citations omitted).

2.  Analysis

Defendants argue that the FAC fails to state a claim upon which relief can be granted because (1) Plaintiffs' claims are barred by the *Noerr-Pennington* doctrine; (2) Plaintiffs have failed to state a RICO violation; (3) Plaintiffs have failed to state a claim under ERISA; and (4) the Association Plaintiffs have no standing. The Court addresses each of these in turn.

a.  Noerr-Pennington Doctrine

The *Noerr–Pennington* doctrine derives from the Supreme Court's decisions in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), which recognized that a party is immune from liability for exercising his or her First Amendment right to petition the government. "The doctrine nominally began as a judicially-created limitation on the scope of the Sherman Act with

respect to activities by parties to petition the government to take a certain course of action beneficial to them and harmful to their competitors." *In re Neurontin Antitrust Litigation*, 2009 WL 2751029, *17 (D.N.J. 2009).  However, it has been extended to protect those who petition for other forms of governmental action.  *Id.* (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S. Ct. 609, 30 L. Ed.2d 642 (1972) (administrative and judicial proceedings); *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (municipal ordinances); *Professional Real Estate Investors v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (litigation to protect patent rights).

Defendants argue that Aetna's conduct of sending letters seeking to recoup the alleged overpayments, constitutes petitioning activity protected by the First Amendment.  Defendants rely upon *Sosa v. DIRECTTV, Inc.*, 437 F.3d 923, 940 (9th Cir. 2006), which held that sending a pre-suit demand letter is conduct incidental to a lawsuit and, therefore, falls within the protection of the *Noerr-Pennington* doctrine.

The Court finds that Defendants, in making their argument, construe the nature of Plaintiffs' claims too narrowly.  In contrast to the circumstances in *Sosa*, the FAC does not simply challenge Defendants' act of sending out demand letters.  *See id.* at 932 ("Sosa's lawsuit seeks to impose RICO liability on DIRECTV for sending the demand letters.")  Rather, under a reading appropriate for a 12(b)(6) motion, Plaintiffs are alleging that when Defendants have pursued repayment of allegedly incorrectly benefits paid they have failed to comply with, for example, ERISA's disclosure and review procedures.  Consequently, the Court rejects Defendants' argument that dismissal is warranted at this time under *Noerr-Pennington*.  The Court shall deny Defendants' motion without prejudice to Defendants

raising the issue in a future summary judgment motion should it be appropriate after relevant discovery and further factual development of Plaintiffs' claims.

b.  RICO claim

Next, Defendants argue that Plaintiffs have failed to state a plausible RICO claim. The FAC asserts that Defendants violated sections 1962(c) and 1962(d) of the federal RICO Act.  Section 1962(c) provides that

> [i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  Section 1962(d)  makes it unlawful for any person to conspire to violate subsection (a), (b) or (c) of § 1962.  18 U.S.C. § 1962(d).

To establish a claim under § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Lum v. Bank of Am.*, 361 F.3d 217, 223 (3d Cir. 2004).  The RICO statute defines a pattern of racketeering activity as requiring at least two predicate acts of racketeering within a ten year period. 18 U.S.C. § 1961(5).  Moreover, under § 1962(c), all predicate acts in a pattern must somehow be related to the enterprise and amount to or pose a threat of continued criminal activity.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Banks v. Wolk*, 918 F.2d 418, 424 (3d Cir. 1990).  Under the relatedness requirement, "predicate acts are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Tabas v. Tabas*, 47 F.3d 1280, 1292 (3d Cir.1995) (quoting *H.J.*, 492 U.S. at 240).

Additionally, in order to assert a proper RICO claim, a plaintiff must "allege and prove the existence of two distinct entities: (1) a person; and (2) an enterprise that is not simply the same person referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L.Ed.2d 198 (2001).  The RICO statute defines enterprise as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  "If the members of the enterprise are the same as the persons, the distinctness requirement has not been met, as the 'person' and the 'enterprise' must not be identical." *Zavala v. Wal-Mart Stores, Inc.*, 447 F.Supp.2d 379, 383 (D.N.J. 2006).  In order to establish an enterprise, a plaintiff must provide "(1) proof of an ongoing organization, (2) proof that the associates function as a continuing unit, and (3) proof that the enterprise is an entity separate and apart from the pattern of activity in which it engages." *HT of Highlands Ranch, Inc. v. Hollywood Tanning Systems, Inc.*, 590 F.Supp.2d 677, 689 (D.N.J. 2008).

Furthermore, to establish standing under section 1964(c), "a RICO plaintiff [must] make two related but analytically distinct threshold showings ...: (1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." *Maio v. Aetna, Inc.*, 221 F.3d 472, 483 (3d Cir.2000) (footnote omitted).   As this Court has previously noted

> [a]lthough RICO is to be read broadly, section 1964(c)'s limitation of RICO standing to persons injured in their business or property has a restrictive significance.  That limitation helps to assure that RICO is not expanded to provide a federal cause of action and treble damages to every tort plaintiff, and focuses the inquiry of injury to the plaintiff's financial position. Therefore, a plaintiff, to make a showing of standing under 18 U.S.C. § 1964(c), must proffer proof of a concrete financial loss and not mere injury to a valuable intangible property interest.

9

*Township of Marlboro v. Scannapieco*, 545 F.Supp.2d 452, 458 (D.N.J. 2008)

Considering the relevant standards, the Court finds that Plaintiffs have failed to state a RICO claim for a number of reasons. First, Plaintiffs have failed to adequately plead a RICO enterprise. The FAC does not sufficiently set forth the structure of what Plaintiffs deem a "recoupment enterprise" in which Aetna, the NHCCA, IBM, AfterMath and attorney Barbara Tancredi were associated, despite conclusory allegations that these purported "members … function as a structured and continuous unit, and perform roles consistent with this structure." FAC ¶ 326. Rather, as Defendants point out, the relationships among Aetna, the NHCCA, IBM, AfterMath and Barbara Tancredi appears to be nothing more than ordinary business relationships. For example, Defendants purchased and used certain software from IBM and hired attorney Barbara Tancredi and AfterMath to assist with collecting and recovering overpayments. Facts describing the "ordinary operation of … garden-variety" business relationships are not sufficient to state a RICO claim. *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009). *See also*, *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010) (members of enterprise must function as a unit or be put together to form a whole).

Second, the Court agrees with Defendants' argument that the RICO claim fails because the "recoupment enterprise" alleged by Plaintiffs is insufficiently distinct from the defendants themselves. As noted above, a RICO claim requires the existence of "two distinct entities" – a person and an enterprise. *Cedric Kushner Promotions*, 533 U.S. at 161. The "person" charged with violating the RICO statute cannot be the same entity as the "enterprise." *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., Inc.*, 46 F.3d 258, 268 (3rd Cir.1995) ([A] viable § 1962(c) action requires a claim against defendant 'persons' acting

through a distinct 'enterprise.' "); *Hirsch v. Enright Refining Co.*, 751 F.2d 628, 633 (3d

Cir.1984) (establishing the "*Enright*" rule; "a violation of section 1962(c) by a corporate

entity requires an association with an enterprise that is not the same corporation.")[1]  Because

a corporate entity may not be both the person and the RICO enterprise, to be liable as a

defendant under section 1962(c), a corporation must associate with others to form an

enterprise that is sufficiently distinct from itself.  In the present case, the alleged association-

in-fact enterprise consists of Aetna Inc., several of its subsidiaries and affiliates, and third-

parties acting as Aetna's agents.  This is not sufficient to fulfill the distinctiveness

requirement of § 1962(c).  *See, e.g.,  Riverwoods Chappaqua Corp. v. Marine Midland Bank,

N.A.*,  30 F.3d 339, 344 (2d Cir. 1994) ("[B]y alleging a RICO enterprise that consists merely

of a corporate defendant associated with its own employees or agents carrying on the regular

affairs of the defendant, the distinctness requirement may not be circumvented"); *Brittingham

v. Mobil Corp.*, 943 F.2d 297, 301 (3d Cir. 1991) ("A corporation must always act through its

employees and agents, and any corporate act will be accomplished through an 'association' of

these individuals or entities; … the *Enright* rule would be eviscerated if a plaintiff could

successfully plead that the enterprise consists of a defendant corporation in association with

employees, agents, or affiliated entities acting on its behalf.") *rev'd on other grounds* 46 F.3d

258 (3d Cir. 1995).

---

[1]*Enright* offered two rationales for its holding that a RICO defendant must be distinct from
the alleged enterprise.  The first was the plain text of the RICO statute, and the second was a
policy based argument that Congress intended to limit liability to persons rather than
potentially innocent enterprises that were victims of individuals' racketeering activity.
Although the latter of these rationales was later rejected by the Supreme Court in *Sedima v.
Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346(1985), the ultimate holding has
survived because the first rationale is mutually exclusive of the second.  *See Jaguar Cars,
Inc.*, 46 F.3d 258, 268 (3d Cir.1995) ("[w]e conclude that the essential holding of Enright
remains undisturbed.")

Last, Plaintiffs have not adequately pled the requisite injury to business or property proximately caused by the alleged RICO violation.  A plaintiff lacks standing to bring a RICO claim unless he has suffered a concrete financial loss.  *See Maio v. Aetna, Inc.*, 221 F.3d 472 (3d Cir. 2000).   Plaintiffs Manz and Egozi, for example, with the exception of the generalized allegation that "Plaintiffs were injured in their business or property by the Defendants' overt acts of mail and wire fraud," FAC ¶ 334, allege no specific injury.  As such, their RICO claim fails.  As Defendants note, boilerplate allegations that "simply alleg[e] an injury to business or property resulting from an alleged RICO violation is not enough to defeat a motion to dismiss."  *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 WL 2043604, at *11 (D.N.J. July 10, 2009); *see also Iqbal*, 129 S. Ct. at 1949 ("formulaic recitation of the elements of a cause of action" insufficient)).

The remaining Individual Defendants allege damages in the form of (1) time and money spent to respond to Defendants' requests; and (2) refusals by Defendants to reimburse certain claims submitted.  Neither is sufficient.  As to the first, vague and non-specific allegations regarding lost "time and money" cannot confer RICO standing, as allegations of "concrete financial loss" are required.  *See Parker v. Learn Skills Corp.*, 530 F.Supp.2d 661, 678 (D. Del. 2008) (allegations of lost revenue and market share "without identifying the lost revenue or market share percentage" not sufficient to confer RICO standing).  As to the second, Plaintiffs admit that they are owed payments from patients for amounts not reimbursed, FAC ¶ ¶12, 14, and there is no allegation that this debt from the patients is uncollectable.  An alleged "lost" debt can support a RICO claim "only if the debt (1) cannot be collected (2) by reason of a RICO violation."  *Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165 (2d Cir. 1993) (refusing to include unpaid claims as RICO injury where

12

claim amounts were still collectible and could be fully satisfied and, as such, finding that plaintiff lacked standing under RICO).  Consequently, these Plaintiff's lack standing to bring a RICO claim.

With respect to Plaintiff's § 1962(d) claim, "[a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient."  *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993).  Accordingly, Plaintiffs' RICO claims are dismissed in their entirety.

c.  ERISA Claims

The FAC contains four counts alleging ERISA violations.  Count I, brought on behalf of the putative "ERISA Recoupment Class,"[2] alleges that to the extent Aetna determined that charges submitted for reimbursement by the Individual Providers were no longer Covered Services, such a finding is an "adverse benefit determination" under ERISA.  According to Plaintiffs, Aetna sought repayment of these benefits without complying with the requirements of ERISA.  Count II, brought on behalf of the putative "Chiropractic Subclass,"[3] alleges that

---

[2] Defined in the FAC as:

All healthcare providers who, from six years prior to the filing date of this action to its final termination ("ERISA Class Period"), provided healthcare services to patients insured under ERISA healthcare plans insured or administered by Aetna, and who, after having received payments from Aetna, were subjected to retroactive requests for repayment of all or some portion of such payments and Pre-Payment Reviews. (FAC ¶ 344).

[3] Defined in the FAC as:

All healthcare providers who, from six years prior to the filing date of this action to its final termination ("Chiropractic Subclass Period"), provided chiropractic services to patients insured under ERISA healthcare plans insured or administered by Aetna where Aetna deemed such services to be not covered under its

Aetna violated ERISA in making certain "adverse benefit determinations" with regard to specified chiropractic services for which Plaintiffs Restivo, Carnucci, Foglia, Manz, Vincent and Yarns sought reimbursement.  Count III, brought on behalf of the "ETS subclass,"[4] alleges that Aetna made certain adverse benefit determinations with respect to certain operative services provided by Plaintiff Egozi and the putative class and failed to comply with ERISA in making these adverse benefit determinations.  Count IV alleges that Aetna, as an alleged "plan administrator," violated ERISA § 503 in that it failed to give the requisite full and fair review of denied claims.

Overall, Plaintiffs are challenging Aetna's practice of demanding the repayment of healthcare benefits that Aetna later determines had been improperly paid to the provider. Plaintiffs allege that Aetna is required to and failed to comply with certain procedural protections provided by ERISA in demanding such repayment from providers.  For example, Plaintiffs assert that Aetna, prior to requesting repayment from a provider, must issue a revised Explanation of Benefits ("EOB") to the insured.  FAC ¶ 20.  Plaintiffs also challenge Aetna's "prepayment review" process as to the individual providers, under which Aetna reviews records before it pays a claim submitted by a provider from whom Aetna has requested repayment.

---

healthcare plans pursuant to their "experimental" or "investigational" exclusions. (FAC ¶ 347).

[4] Defined in the FAC as:

All healthcare providers who, from six years prior to the filing date of this action to its final termination ("ETS Subclass Period"), provided an ETS operative procedure to patients insured under ERISA healthcare plans insured or administered by Aetna where Aetna deemed such services to be not covered under its healthcare plans due to the failure of the provider to require the patient first to attempt the use of iontophoresis. (FAC ¶ 349).

Defendants argue that Plaintiffs' claims do nothing more than seek to use ERISA to absolve providers from the consequences of fraudulent billing practices and to bring insurer anti-fraud efforts to a standstill.  They contend that there exist a number of reasons that dismissal of Plaintiffs' ERISA claims is warranted.

First, Aetna contends that Plaintiffs' ERISA claims should be dismissed because Aetna's overpayment letters do not violate ERISA in that they are not "adverse benefit determinations" that trigger ERISA notice and appeal rights, there is no threat of actual beneficiary injury, and the overpayment letters arise out of the insurer's independent duties under state laws regarding fraud.  Plaintiffs, in response, argue that Aetna's efforts to recoup benefits involve disputes over benefits due and, therefore, fall under ERISA.  Plaintiffs also contend that each of them have asserted claims pursuant to an assignment of benefits from subscribers to an ERISA insured plan and, therefore, have standing to pursue ERISA claims for benefit.  They further argue that they may pursue claims under ERISA because Aetna is challenging their right to payment under the Plans and disputes over whether services are "experimental and investigational" fall under ERISA.

Second, with regard to Aetna's prepayment review, Defendants argue that ERISA permits such prepayment review, that Plaintiffs' challenge to Aetna's denial of benefits resulting from the prepayment review process is factually unsupported, and that Plaintiffs did not exhaust their administrative remedies.  Plaintiffs respond that their challenge is proper because they are asserting that the prepayment review process is a sham and a pretext for blanket benefit denials, and is being done while bypassing ERISA procedures.  Plaintiffs also point to allegations that they sought to challenge Aetna's repayment demands through an administrative process but contend Aetna failed to provide them with a viable appeal option.

15

Finally, as to Count IV, Aetna contends that this count should be dismissed because the only remedy available for a violation of § 503 is remand to the plan administrator for a full and fair review, *see Syed v. Hercules Inc.*, 214 F.3d 155, 162 (3d Cir. 2000), and Aetna alleges that Plaintiffs did not ask for such relief.  Plaintiffs dispute this, alleging that they seek precisely such relief.

Having carefully reviewed the FAC and accompanying affidavit, the Court is not persuaded that dismissal of Plaintiffs' ERISA claims is warranted at this time.  While Aetna has raised questions as to the viability of Plaintiffs' ERISA claims, the Court concludes that a more complete factual picture regarding Aetna's "recoupment"/anti-fraud efforts is necessary to ultimately resolve the issue.  Thus, resolution of the issue is not appropriate on a motion under Rule 12(b)(6).  The Court denies Aetna's motion without prejudice to the filing of an appropriate summary judgment motion in the future.

d.  Standing of Association Plaintiffs

Defendants move to dismiss the claims of the Association Plaintiffs arguing that the Association Plaintiffs lack standing to bring their claims.  In their opposition brief, Plaintiffs clarify that the Association Plaintiffs seek only "injunctive and equitable relief" on behalf of their members and are not seeking damages on their own behalf, and they argue that standing exists as to such claims.  Regarding organizational standing, the United States Supreme Court has set out three prerequisites:

> an association has standing to bring suit on behalf of its members when; (a) its members would otherwise have standing to sue in their own right; (b) the interests at stake are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

With respect to Plaintiffs' ERISA claims, Aetna argues that Plaintiffs fail to meet the first and third requirements of *Hunt*.  As to the first requirement, Defendants assert that while the FAC alleges that the Individual Plaintiffs received assignments from insured, *see, e.g.*, FAC ¶ 5 ("Aetna paid Plan benefits directly to the Individual Plaintiffs as assignees under claim assignments received from Aetna Insureds …"); ¶ 15 ("The Individual Plaintiffs all obtain benefit claim assignments from their Aetna Insureds that give the Individual Plaintiffs the right to bill and receive payment from Aetna directly for their services."), the FAC is devoid of allegations that any members of the Association Plaintiffs obtained an assignment of benefits from their patients, which is a prerequisite for the provider to have standing.  *See Horizon Blue Cross Blue Shield of New Jersey v. East Brunswick Surgery Center*,  623 F.Supp.2d 568, 575 (D.N.J. 2009).  In response to Defendants' argument, Plaintiffs point out that the FAC alleges that, prior to seeking repayment, Aetna had already paid providers directly for their service, and Plaintiffs contend that such direct payment evinces the necessary assignment for standing.

As to the third *Hunt* requirement, Defendants contend that substantial individual members' participation will be required to demonstrate that each received a valid assignment and have exhausted administrative remedies.  The Association Plaintiffs respond that because their objective is to redress allegedly improper practices by Aetna and they seek only injunctive and declaratory relief on behalf of their members, limited participation by their members is necessary.  Moreover, they note that as this question is presently before the Court on a motion to dismiss for lack of standing, they should be given the opportunity to move

17

forward and establish their claims without substantial individual participation. *See*

*Pennsylvania Psychiatric Society v. Green Spring Health Services*, 280 F.3d 278, 286 (3d Cir.

2002) ("[A]t this stage of the proceedings on a motion to dismiss for lack of standing, we

review the sufficiency of the pleadings and must accept as true all material allegations of the

complaint and must construe the complaint in favor of the plaintiff.  For this reason, we

believe the [association plaintiff's] suit should not be dismissed before it is given the

opportunity to establish the alleged violations without significant individual participation. …

Because this appeal arises on a motion to dismiss, the [association plaintiff] should be allowed

to move forward with its claims within the boundaries of associational standing.").

The Court finds that dismissal of the Association Plaintiffs is not warranted at this

time.  Construing the FAC in favor of Plaintiffs as the Court must on a 12(b)(6) motion, the

Court finds Plaintiffs' allegations that the Association Plaintiffs' members had received

payments directly from Aetna sufficient to withstand Defendants' 12(b)(6) challenge under

the first prong of *Hunt*.  Turning to the third *Hunt* prong, as the Court has already determined,

issues related to Plaintiffs' ERISA claims, including the exhaustion of administrative

remedies, require further factual development.  The Court, therefore, denies Defendants'

motion to dismiss the Association Plaintiffs for lack of standing without prejudice to the issue

being raised, if appropriate, by way of a summary judgment motion after relevant discovery

has been taken.

B.  Cross-Motion for Judicial Estoppel

In moving to dismiss Plaintiffs' ERISA claims, Aetna has asserted that ERISA is not

implicated by the conduct complained of by Plaintiffs.  By way of their cross-motion,

Plaintiffs ask the Court to apply judicial estoppel and prevent Aetna from asserting that such

conduct is not covered by ERISA, alleging that Aetna's argument is directly contrary to positions taken by Aetna before other courts. Specifically, Plaintiffs refer to *Aetna Life Ins. Co. v. DFW Sleep Diagnostics Center*, 2004 U.S. Dist. Lexis 12780 (E.D. La. July 8, 2004) and *Lone Star OB/Gyn Assoc. v. Aetna Health Inc.*, 579 F.3d 525 (5th Cir. 2009). In *DFW*, Aetna, as plaintiff, sought repayment from provider defendants for sleep study services rendered to Aetna insureds. In response to a motion to dismiss for lack of standing, Aetna argued that it had standing as a plan administrator under ERISA. *Lone Star*, on the other hand, involved claims by providers that Aetna failed to pay the providers for services rendered to patients. Aetna removed that case to federal court based upon ERISA preemption.

"[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001). The Supreme Court has noted that there are several factors that a court considers in determining whether to apply the doctrine:

> First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*Id.* at 750-751 (citations and internal quotations omitted). These considerations are neither "inflexible [n]or exhaustive," and "additional considerations may inform the doctrine's application in specific factual contexts." *Id.* at 751. Notably, judicial

estoppel is "an extreme remedy, to be used only when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court." *Chao v. Roy's Constr., Inc.*, 517 F.3d 180, 186 n.5 (3d Cir. 2008) (citation and internal quotations omitted).  In this circuit, application of judicial estoppel has three threshold requirements:  "first, the party in question must have adopted irreconcilably inconsistent positions; second, the party must have adopted these positions in "bad faith"; and third, there must be a showing that judicial estoppel is tailored to address the harm and that no lesser sanction would be sufficient." *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319-20 (3d Cir. 2003) (quoting *Montrose Med. Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001)).

Applying the standards above, Plaintiffs have not shown that judicial estoppel is appropriate in this case.  As an initial matter, almost the entirety of Plaintiffs' brief is focused on explaining how Aetna's earlier positions are allegedly inconsistent with its current arguments.  However, the Court finds the cases cited by Plaintiffs to be factually and procedurally distinguishable from the instant case.  As such, the positions taken by Aetna therein are not necessarily irreconcilably inconsistent with positions taken in this litigation.  Moreover, irreconcilable inconsistency is only one of the three elements in the relevant analysis, and all three must be met for the Court to apply the doctrine.  *In re Kane*, 628 F.3d 631, 639 (3d Cir. 2010).  Plaintiffs have not established the existence of (and indeed, Plaintiffs have not even addressed) the remaining two threshold requirements for the application of judicial estoppel.  Consequently, Plaintiffs' cross-motion for the application of judicial estoppel is denied.

C.  Motion to Strike Class Allegations

Aetna moves to strike Plaintiffs' class allegations, alleging that Plaintiffs cannot meet the requirements of Rule 23(a) and that the proposed classes and subclasses cannot qualify under Rule 23(b).  Plaintiffs argue that Aetna's motion is premature, and the Court agrees. Decisions from this District as well as others "have made clear that dismissal of class allegations at this sta[g]e should be done rarely and that the better course is to deny such motion because 'the shape and form of a class action evolves only through the process of discovery." *Myers v. MedQuist, Inc.*, 2006 WL 3751210, at * 4 (D.N.J. December 20, 2006) (citing *Gutierrez v. Johnson & Johnson, Inc.*, 2002 U.S. Dist. LEXIS 15418, *16 (D.N.J. 2002)); *Abdallah v. Coca–Cola Co.*, 1999 U.S. Dist. LEXIS 23211 (D. Ga. July 16, 1999); 7AA Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 1785.3 (the practice employed in the overwhelming majority of class actions is to resolve class certification only after an appropriate period of discovery)). As the court in *Myers* noted,

> [W]hile it is the plaintiff's burden to prove that the proposed class action satisfies each of the required elements of Rule 23(a) and one of the prerequisites of Rule 23(b), *see Baby Neal v. Casey*, 43 F.3d 48, 55 (3d Cir.1994), the "court may find it necessary ... to analyze the elements of the parties' substantive claims and review facts revealed in discovery in order to evaluate whether the requirements of Rule 23 have been satisfied." *In re Ford Motor Ignition Switch Prods. Liab. Litig*., 174 F.R.D. at 338 (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir.1996)). Moreover, "[a]s a practical matter, the court's [certification decision] usually should be predicated on more information than the complaint itself affords ... [and] [t]hus, courts frequently have ruled that discovery relating to the issue whether a class action is appropriate needs to be undertaken before deciding whether to allow the action to proceed on a class basis." 5C Wright, Miller & Kane, Federal Practice & Procedure Civil 3d § 1785.3.

2006 WL 3751210, at * 5.  Given the current stage of the instant litigation, the Court denies Aetna's motion to strike Plaintiff's class allegations.

<u>D.  Motion to Enforce Settlement Agreement</u>

Plaintiff Foglia is a licensed chiropractor in the State of New York who has provided chiropractic services for Aetna insureds.  FAC ¶ ¶ 28, 122.  Foglia does not have a provider agreement with Aetna and, as such, performs services to Aetna insureds as a non-participating provider.  *Id.* ¶ 12.

On November 6, 2007, Aetna informed Foglia by letter that Aetna was conducting a review of services provided by Foglia for certain patients and requested relevant medical records.  Foglia provided the records to Aetna.  Several months later, on April 14, 2008, Foglia received a letter from Aetna's SIU stating that Aetna had completed its review and it had identified an overpayment in the amount of $15,609.88.  *Id.* ¶ 126.  Aetna asserted two bases for this determination.  First, Aetna claimed that Foglia had submitted claims to Aetna using CPT code 98942  (five region chiropractic manipulative treatment) when only a one or two region manipulation had been performed.  For this, Aetna calculated an overpayment of $11,781.08.  Second, Aetna claimed Foglia had submitted claims using CPT code 97012 (mechanical traction) where a Vax-D table had been used, and Aetna does not allow payment for Vax-D therapy because it considers the procedure "experimental and investigational."  *Id.* ¶ 129.  In this regard, Aetna's calculated overpayment totaled $3,828.80.

Folgia contested Aetna's determination, and Aetna subsequently withdrew its demand for repayment with respect to Foglia's billing of code 98942.  *Id.* ¶ 133.  Ultimately, Foglia and Aetna entered into a settlement agreement ("Settlement Agreement") as to the remaining claim, under which Foglia agreed to repay $1,915 to Aetna.  *Id.* ¶ 136; Certification of Tracy Shorts, ("Shorts Cert.") Ex. D.  The Settlement Agreement contains a broad "Mutual Release and Discharge" as follows:

22

> Aetna and Provider, respectively, release and forever discharge the other from
> any and all past, present, or unknown claims, demands, obligations, actions,
> causes of action, rights, damages, costs, losses of services, expenses and
> compensation of any nature whatsoever, whether based on a tort, contract or
> any other theory of recovery, including but not limited to any and all damages
> of any kind which may have accrued and hereafter accrue on account of,
> arising from, or which stems from the Parties' Dispute.

Shorts Cert., Ex. D at 1.  The "Parties' Dispute" as defined by the Settlement Agreement is

the disputed allegation by Aetna that Foglia "received an overpayment from Aetna resulting

from purported inappropriate billing of CPT code 97012 and received payment from Aetna

for such fees for adjudicated claims during the time period April 8, 2006 through March 12,

2008."  *Id.*  Aetna contends this Settlement Agreement bars Foglia's claims in the FAC and

seeks dismissal of those claims.

In response to Aetna's motion, Foglia admits that he entered into the Settlement

Agreement and that the agreement was "the result of at least a certain degree of negotiation

between Dr. Foglia, his attorneys, and Aetna."  Pl. Opp. at 8.  However, Foglia claims that the

agreement is unenforceable because it was improperly procured by Aetna through the use of

coercion.  Specifically, Foglia claims (and, for the purposes of this motion, Aetna does not

dispute), that Aetna "threatened" Foglia with the possibility that they would require pre-

payment review before processing his future claims with respect to the disputed billing codes.

The Court finds Foglia's argument to be without merit.

Under New York law,[5] "[a] claim of duress or coercion sufficient to vitiate a contract

requires a showing of: '(1) a threat, (2) which was unlawfully made, and (3) caused

involuntary acceptance of contract terms, (4) because the circumstances permitted no other

---

[5] The Settlement Agreement contains a New York choice of law provision.  Shorts Cert. Ex.
D at 2.  There appears to be no dispute that New York law applies to this issue as both parties
have briefed the issue under New York law.

alternative.' " *Intelligent Digital Systems, LLC v. Visual Management Systems. Inc.*, 736

F.Supp.2d 596, 601 (E.D.N.Y. 2010) (quoting *Kamerman v. Steinberg*, 891 F.2d 424, 431 (2d

Cir.1989)).  The defense of coercion exists "only where the party resisting contractual

enforcement can show that a wrongful (unlawful) threat exists and, if it does, whether that

threat went so far as to deprive the plaintiff of its free will (that is, take away the plaintiff's

alternatives)."  *Id.* (quotations omitted).  Significantly, "it is not duress to threaten an action

which is legally permissible."  *Kamerman*, 891 F.2d at 432.

Here, Foglia has failed to show an "unlawful" threat on the part of Defendant.  Indeed,

Plaintiffs have failed to identify what is unlawful about Aetna telling Foglia that if he failed to

remedy his allegedly incorrect billing practices, Defendants would require a review of

underlying medical documentation before processing future claims submitted under the

disputed code.  Additionally, Foglia cannot show that such a threat by Aetna "went so far as

to deprive [Foglia] of his free will."   Where, like here, "the possibility of obtaining redress

through litigation remained available, any claim of duress must fail."  *Milgrim v. Backroads,*

*Inc.*, 142 F.Supp.2d 471, 475 (S.D.N.Y. 2001) (finding that even where plaintiff was "faced

with the Hobson's choice of signing the Release or forfeiting all or substantially all of [the

monies paid for a European tour], that choice … is insufficient as a matter of law to constitute

duress" because plaintiff could have commenced a lawsuit to obtain a refund).  Consequently,

the Court finds that the Settlement Agreement is enforceable and Foglia has released his right

to bring the claims in this action.  Consequently, all claims asserted by Plaintiff Foglia are

dismissed.

E.  Motion to Compel Arbitration as to Plaintiffs Egozi and Manz

With respect to providing services to Aetna insureds, Plaintiffs Egozi and Manz are "participating" or "par" providers, that is, they provide services to Aetna insureds pursuant to contracts both have entered into with the insurer.  FAC ¶ 13.  Manz provides services pursuant to the terms of a Physician Group Agreement ("Manz Agreement"), while Egozi provides services pursuant to the terms of a Specialist Physician Agreement ("Egozi Agreement", together with the Manz Agreement, "provider agreements").  *Id.*; Short Cert., Ex. A, B.  Both agreements contain provisions regarding the arbitration of disputes.

The arbitration provision of the Manz Agreement provides as follows:

Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules"). The arbitration shall be governed by the Federal Arbitration Act, (9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent therewith or that would produce a different result, and the judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Except as may be required by law or to the extent necessary in connection with a judicial challenge, or the enforcement of an award, neither a party nor the arbitrator may disclose the existence, content, record, or results of an arbitration. Fourteen (14) calendar days before the hearing, the parties will exchange and provide to the arbitrator (a) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (b) premarked copies of all exhibits they intend to use at the hearing. Depositions for discovery purposes shall not be permitted. The arbitrator may award only monetary relief and is not empowered to award damages other than compensatory damages.

Shorts Cert. Ex. A ¶ 10.2.2.

Similarly, the Egozi Agreement provides:

Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or

permanent injunctive relief or any other form of equitable relief, shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole arbitrator in accordance with the AAA's Commercial Arbitration Rules ("Rules"). The arbitration shall be governed by the Federal Arbitration Act, (9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent therewith or that would produce a different result, and the judgment on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. Except as may be required by law or to the extent necessary in connection with a judicial challenge, or the enforcement of an award, neither a party nor the arbitrator may disclose the existence, content, record, or results of an arbitration. Fourteen (14) calendar days before the hearing, the parties will exchange and provide to the arbitrator (a) a list of witnesses they intend to call (including any experts) with a short description of the anticipated direct testimony of each witness and an estimate of the length thereof, and (b) premarked copies of all exhibits they intend to use at the hearing. Depositions for discovery purposes shall not be permitted. The arbitrator may award only monetary damages in accordance with this Agreement.

Shorts Cert. Ex. B, ¶ 8.3.  Defendants argue that these provisions are applicable to the instant dispute and seek to compel arbitration and dismiss the claims of Manz and Egozi. Furthermore, Aetna argues that Egozi is prohibited by his agreement from advancing his claims by way of a class action.

As Plaintiffs do not contest the validity of the arbitration clauses in their respective agreements, *see* Opp. Brf. at 14, the issue to be addressed by this Court centers on whether the claims in this case fall within those types of disputes that the parties agreed to arbitrate.  "In determining whether the particular dispute falls within a valid arbitration agreement's scope, "there is a presumption of arbitrability[:] an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) (quoting *AT&T Technologies, Inc. v. Comm'ns Workers*, 475 U.S. 643, 648-49, 106 S.Ct. 1415, 1418, 89

L.Ed.2d 648 (1986) (alteration in original).[6]  Consequently, a court must construe all doubts concerning the scope of arbitrable issues in favor of arbitration.  *Great W. Mortgage Corp. v. Peacock*, 110 F.3d 222, 228 (3d Cir. 1997).  However, "while interpretive disputes should be resolved in favor of arbitrability, a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt."  *Gay v. CreditInform,* 511 F.3d 369, 387 (3d Cir. 2007) (internal quotations omitted).

A court addressing the question of whether a claim falls within the scope of an arbitration agreement is to focus "on the factual underpinnings of the claim rather than the legal theory alleged in the complaint."  *Medtronic AVE, Inc. v. Advanced Cardiovascular Systems, Inc.*, 247 F.3d 44, 55 (3d. Cir. 2001).  Furthermore, when language such as "arising out of" appears in an arbitration agreement, as is the case here, such language is to be interpreted broadly.  *See Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000).

With these principles in mind, the Court turns to the question of whether the claims raised by Egozi and Manz fall within the scope of the parties' arbitration agreements.  In both the Egozi Agreement and the Manz Agreement the parties have agreed to arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof, except for temporary, preliminary, or permanent injunctive relief or any other form of equitable relief." Shorts Cert. Ex. A at ¶ 10.2.2, Ex. B at ¶ 8.3.  Egozi and Manz argue that their claims are outside the scope of this provision because (1) they allege their claims are equitable in nature and the arbitration agreements expressly exclude claims seeking any kind of equitable relief; and (2) their claims do not "aris[e] out of or relat[e] to" their respective

---

[6] Where there is a valid agreement to arbitrate, the determination of whether "a particular dispute is within the class of those disputes governed by the arbitration clause ... is a matter of federal law."  *Century Indem. Co.* 584 F.3d at 524.

agreements.  In response, Defendants argue that although certain claims may be couched in equitable terms, Egozi's and Manz's claims are not equitable because these plaintiffs are, in essence, seeking sums allegedly owed to them in accordance with their provider agreements. Further, Aetna contends that all of Egozi's and Manz's claims arise out of or relate to their provider agreements and, thus, fall within the scope of the arbitration agreement.

The Court agrees with Defendants that the ultimate relief sought by Egozi and Manz is legal rather than equitable, as they primarily seek monies allegedly due and owing in accordance with their provider agreements.  *See, e.g.*, FAC ¶ 25 ("Plaintiffs seek … to order Aetna to return to all Providers any funds it improperly collected during the Class Period based on its improper Recoupment Efforts); ¶ 350 (Egozi seeks to require Aetna to return any funds it has received from members of the ETS Subclass); FAC ¶ 351(7) (alleging common claim as "[w]hether Class Members may recover amounts repaid to Aetna or unpaid benefits and if so, the amount they should receive").  As Aetna points out,

> a plaintiff cannot convert a claim of damages for breach of contract into an equitable claim by the facile trick of asking that the defendant be enjoined from refusing to honor its obligation to pay the plaintiff what the plaintiff is owed under the contract and appending to that request a request for payment of the amount owed. A claim for money due and owing under a contract is "quintessentially an action at law."

*Wal-Mart Stores, Inc. Associates' Health and Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000).

Furthermore, the Court finds that Egozi's and Manz's claims arise out of their provider agreements.  As an initial matter, the claims clearly relate to services these medical professionals provided in accordance with their provider agreements.  Also, these plaintiffs' challenges to Aetna's actions relate directly to provisions within their respective agreements.

28

For example, both Egozi and Manz challenge Aetna's determination of and efforts to recover alleged overpayments, which relates to Section 3 of the Manz Agreement and Section 4 of the Egozi Agreement, which govern payments to providers.  Thus, these plaintiffs' claims arise out of and/or relate to their respective agreements.  Consequently, the Court grants Defendants' motion to compel arbitration and shall dismiss the claims of Plaintiffs Egozi and Manz.[7]

**III.  Conclusion**

For the reasons above, Defendant's motion to dismiss is granted as to Plaintiff's RICO claims and denied in all other respects.  Defendants' motion to enforce the settlement agreement and their motion to compel arbitration are also granted.  Defendants' motions to strike class allegations and Plaintiffs' cross-motion are denied.  An appropriate Order accompanies this Opinion.

/s/Joel A. Pisano
Joel A. Pisano, U.S.D.J.

Dated:  June 17, 2011

---

[7] In light of the Court's decision it is not necessary for the Court to reach Aetna's remaining arguments.  However, as noted above, Aetna also argues that Egozi's claims should be dismissed because his agreement contains a class action waiver.  Section 8.4 of that agreement provides:

Company and Physician agree that any arbitration *or other proceeding related to a dispute arising under this Agreement* shall be conducted solely between them.  Neither party shall request, nor consent to any request, that their dispute be joined or consolidated for any purpose, including without limitation any class action or similar procedural device, with any other proceeding between such Party and any third party.

Shorts Cert. Ex. B.  Thus, had the Court held otherwise with respect to Aetna's motion to compel arbitration, it would nevertheless dismiss Egozi's claims from this action in light of this provision.